**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Timothy Logsdon

v. Case No. 16-cv-502-LM

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]

**SUPERSEDING REPORT AND RECOMMENDATION**

Plaintiff Timothy Logsdon, an inmate at the New Hampshire State Prison ("NHSP"), seeks monetary and injunctive relief, claiming that the defendants violated his constitutional rights by denying him visits from certain family members. Invoking 42 U.S.C. § 1983, Logsdon alleges that the restrictions on his family's visits violate his First, Fifth and Fourteenth Amendment rights of familial association. Before the court is defendants' motion for summary judgment (Doc. No. 50), to which plaintiff has objected (Doc. No. 56). Defendant's motion has been referred to the undersigned magistrate judge for a report and recommended disposition. See Aug. 1, 2018 Order; LR 72.1. For the reasons that follow, the district court judge should grant the defendant's motion for summary judgment.

[1]The defendants named in the complaint are New Hampshire Department of Corrections ("DOC") Commissioner William Wrenn, New Hampshire State Prison ("NHSP") Warden Michael Zenk, NHSP Director of Security and Training Chris Kench, and (former) DOC Victim Services Coordinator Amanda Breen. Each of these defendants is sued in his or her individual and official capacities.

**Summary Judgment Standard**

"The purpose of summary judgment is to enable a court 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Fernández-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 328 (1st Cir. 2015) (citation omitted). "Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 20-21 (1st Cir. 2018) (citation omitted); see Fed. R. Civ. P. 56(a)). At summary judgment, "[a]n issue is 'genuine' if the evidence would enable a reasonable factfinder to decide the issue in favor of either party." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). "A fact is 'material' when its (non)existence could change a case's outcome." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir.), review denied, 885 F.3d 52 (1st Cir. 2018).

To obtain summary judgment, "[t]he moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986). "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853

(1st Cir. 2016) (citation omitted). Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" Id. (citation omitted). The nonmoving party's failure to prove any essential element of a claim "'necessarily renders all other facts immaterial.'" Delgado v. Aero Inv. Corp., 601 F. App'x 12, 15 (1st Cir. 2015) (quoting Celotex Corp., 477 U.S. at 323). The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment." Flovac, Inc., 817 F.3d at 853.

At the summary judgment stage, the court draws "'all reasonable inferences in favor of the non-moving party,' but disregard[s] 'conclusory allegations, improbable inferences, and unsupported speculation.'" Fanning v. FTC, 821 F.3d 164, 170 (1st Cir. 2016) (citation omitted). When ruling on cross motions for summary judgment, the court applies the same standard of review, but each motion is viewed separately, with all inferences drawn in favor of the nonmoving party. See Cooper v. D'Amore, 881 F.3d 247, 249-50 (1st Cir. 2018) (citation omitted).

**Background**

The following facts, culled from the parties' filings to date, are undisputed except as otherwise noted. Logsdon is

serving a ten-to-thirty year sentence, imposed in December 2009, for a 2006 felony sexual assault committed against his then three-year old daughter, J.L. See Dec. 1, 2009 Sentencing Order, State v. Logsdon, No. 219-2009-CR-190 (N.H. Super. Ct., Strafford Cty.) (Doc. no. 20-6). As a condition of Logsdon's sentence, the sentencing court prohibited Logsdon from: having contact with J.L. "except as allowed by Family Court orders,"; having unsupervised contact with children younger than sixteen; and having contact with his ex-wife and mother of his three children, Marylisa. Id.

In March 2010, the Family Court issued a Final Parenting Plan ("FPP") in the Logsdons' divorce proceedings. See Mar. 31, 2010 FPP, In re Logsdon, No. 632-2009-DM-9 (N.H. Cir. Ct. - 7th. Cir. – Family Div.) (Doc. No. 50-4). The FPP provided that Logsdon could exchange letters with his three children – J.L., F.L., and P.L. (then ages six, four and nine, respectively) – to the extent recommended and permitted by J.L.'s therapist, Nancy Hoag, who also served as the family therapist for F.L. and P.L. The FPP further provided that the children's telephone or in-person contact with Logsdon, while not recommended at the time the FPP issued, could occur in the future if, and under such circumstances, as may be recommended by the children's therapists.

In February 2013, Logsdon requested and received approval for his children to visit him at the NHSP. In June 2015, he

received approval for Marylisa to visit him. In December 2015, Marylisa and the three children attended a holiday party at the NHSP. June 5, 2018 Decl. of Nicole D. Kipphut (Doc. No. 50-2) ("Kipphut Decl."), ¶ 8. During that event, J.L. became visibly upset, crying through at least part of the visit. Id. at ¶¶ 8, 18; Breen Decl. (Doc. No. 20-1), ¶ 15; March 31, 2017 Letter of Nancy Hoag ("March 2017 Hoag Letter"), (Doc. No. 29), at 19.[2]

After the holiday visit, then-Victim Services Coordinator Breen reviewed the pertinent sentencing and family court orders and interpreted them as barring Logsdon from having contact with J.L., Marylisa or children under the age of sixteen. Id. at ¶ 9. Breen then removed Marylisa, J.L., F.L., P.L. and Logsdon's minor nephew from his approved visitor list. See id.

In May 2016, Logsdon requested approval for his children and Marylisa to attend a Father's Day event at the NHSP scheduled for June 2016. The request was denied, owing to the fact that those family members had been removed from Logsdon's visitor list. When Logsdon inquired further as to the reason

[2]The parties dispute the duration of J.L.'s crying during the December 2015 visit. Logsdon asserts that he only saw JL cry during the first few minutes of the visit. See Pltff. Resp. to Def. Obj. to Pltff. Mot. For Injunctive Relief (Doc. No. 29) at 3. Then NHSP Victim Services Coordinator indicated that Dr. Hoag told her that J.L. was crying "throughout" the visit. Breen Decl. (Doc. No. 20-1) ¶ 15. Marylisa's sister observed that J.L. "tear[ed] up at times during the visit." See March 16, 2017 Letter, Def. Mem., Exh. A-5. For her part, Hoag wrote that she "share[d] with Ms. Breen that JL said she cried at the visit and that [she] was not sure why she cried." March 2017 Hoag Letter (Doc. No. 29), at 19.

his request was denied, he was informed in writing that the visits were denied because the NHSP administration had determined that the FPP only allowed contact by letters through the children's therapist and the Sentencing Order did not allow Logsdon to have any contact with J.L. See June 27, 2016 Inmate request (Doc. No. 50-5.).

On August 25, 2016, the state sentencing court amended Logsdon's sentence to remove the family contact limitations, in accordance with State v. Towle, 167 N.H. 315 (2015), in which the New Hampshire Supreme Court held that a sentencing court exceeded its statutory authority by including a "no contact" provision in a sentence. Logsdon brought the sentencing change to Breen's attention.

The next day, August 26, 2016, Dr. Hoag advised Breen and then Warden Michael Zenk in writing that she and P.L.'s individual therapist had recommended that the children be allowed to visit their father if they wanted to, in accordance with terms established by the therapist, including, among other things, the supervision of the visits by Marylisa and another adult, limitations on physical contact and affection between Logsdon and the children, and the ability of the children to refuse or terminate the visit at any time. See Aug. 26, 2016 Letter of Nancy Hoag (Doc. No. 13-1) ("August 2016 Hoag Letter"). After receiving the August 26 Hoag letter, Breen and other prison officials were concerned that Dr. Hoag did not have

sufficient information concerning the prison's limited ability to provide supervision for Logsdon's visits to ensure that the conditions Hoag identified as necessary were met. See Breen Decl. (Doc. No. 20-1) at ¶¶ 11-12. Breen also expressed concern that Logsdon's adult family members had already brought J.L. to visit Logsdon at the NHSP in apparent violation of court orders in effect at the time of those visits. Id. at ¶ 7. Also, prison officials were concerned that Hoag had made her recommendations without first having seen the sexual offender evaluation Logsdon had undergone at the prison and apparently without being aware that the prison's sexual offender program requires participants to agree that they will not attempt to have contact with their victim(s). Id. at ¶ 16.[3]

In a November 2016 email, Dr. Hoag told Breen that she would send a revised letter with updated recommendations as to

[3]Logsdon disputes the NHSP administration's interpretation of the existing court orders. He asserts that Dr. Hoag did, in fact, recommend the children's visits, in compliance with the court orders. Pltff. Mem. (Doc. No. 56) at 2. While Hoag confirmed that she did recommend the visit, as required, she also noted that she did not communicate her recommendation to the NHSP. See August 2016 Hoag Letter (Doc. 20-4) at 2. Thus, it appears from the record that, at the time Breen removed Logsdon's family members from his approved visitor list and subsequently denied his request for approval for their attendance at the Father's Day event, neither Breen nor anyone else at the NHSP was aware of Hoag's recommendation. It does not appear from the record that Logsdon informed NHSP of the no-contact order, as required by New Hampshire Department of Corrections Policy and Procedure Directive ("PPD") 7.09(IV)(I)(2) (Doc No. 50-3).

Logsdon's visits with his children after reviewing Logsdon's sexual offender evaluation. While it appears that Logsdon refused to consent to Breen sending Dr. Hoag a copy of the evaluation, it appears that Logsdon himself sent Hoag a copy of the evaluation himself after November 2016. Dr. Hoag also noted in the November 2016 email that J.L. had elected not to have telephone or in-person visits with her father. That statement concerned Breen, as it was seemingly inconsistent with Dr. Hoag's statement in the August 26 Hoag Letter that J.L. had felt safe and comfortable during her previous visits with her father.

In two letters sent in March 2017,[4] Dr. Hoag clarified her previous statements and stated that J.L. had not regretted her prior visits with Logsdon, but had simply changed her mind in the fall of 2016 about continuing those visits. Further, Dr. Hoag stated, J.L. wanted the opportunity to have telephone or in-person contact with Logsdon if she so desired in the future. Dr. Hoag also stated that P.L. and F.L. continued to want to have telephone and in-person contact with Logsdon, and that Dr. Hoag continued to recommend that all of the children be allowed, at their option, to have such contact. Dr. Hoag did note that, to the extent Logsdon's successful participation in sexual offender treatment at the prison was conditioned on limitations

[4]Breen resigned her position with the DOC in February 2017. After that, Hoag's communications were with then NHSP Warden Michael Zenk and the new DOC Victim Services Administrator, Nicole Kipphut.

on some or all contact with his children, she supported the enforcement of those limitations.

Subsequent to the change in sentencing conditions and the receipt of Dr. Hoag's recommendations, NHSP officials returned Logsdon's then 16-year old son, his ex-wife and his nephew to Logsdon's approved visitor list. See Kipphut Decl. (Doc. No. 50-2) at ¶ 9. Logsdon may not have visits with J.L. (the victim) pursuant to the sex offender treatment agreement he signed in April 2017. See Pltff. Mem. (Doc. No. 56), at 3. The NHSP has not approved Logsdon's minor, female children – J.L. (age 15) and F.L. (age 13) - for visitation with him. NHSP officials do not believe they can comply with Dr. Hoag's visitation restrictions because the NHSP does not have sufficient personnel to monitor such visits in accordance therewith. Moreover, given how NHSP perceived Logsdon's relatives' inability to remove J.L. after she became upset during her previous visit, prison officials do not believe they can ensure that any visits remain "strictly voluntary," as Dr. Hoag recommended. Id. at ¶¶ 9, 18.

## Discussion

### I. First Amendment Right of Association

While an individual loses many of his constitutional rights upon incarceration, he "retains those First Amendment rights

that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). As particularly relevant here, "freedom of association is among the rights least compatible with incarceration," and "[s]ome curtailment of that freedom must be expected in the prison context." Overton v. Bazzetta, 539 U.S. 126, 131 (2003). An inmate does not have a constitutionally-protected interest in unfettered visitation, as a means of exercising his right to familial association. Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989). The Constitution is not offended where reasonable restrictions are placed on visitation in the prison context. See Wirsching v. Colorado, 360 F.3d 1191, 1198 (10th Cir. 2004) (citing Overton, 539 U.S. at 131).

In evaluating a claim that a prison regulation interfered with an inmate's rights under the First Amendment, the court must accord prison administrators significant deference in defining legitimate goals for the corrections system, and for determining the best means of accomplishing those goals. See Overton, 539 U.S. at 132.

Prison policies limiting the First Amendment right of association will be deemed valid if the limiting regulations are reasonably related to legitimate penological objectives. See id. (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

> Four factors are relevant in making this determination: “(1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives to the prison regulation.”

LeBaron v. Spencer, 527 F. App’x 25, 31–32 (1st Cir. 2013) (quoting Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011)). Where jail policies address legitimate concerns, the inmate bears the burden of showing that the policy was an exaggerated response to those concerns. See Overton, 539 U.S. at 132.

In this case, prison officials have restricted the exercise of Logsdon’s First Amendment right to familial association during his incarceration by removing Logsdon’s minor children and minor nephew from his approved visitor list, resulting in Logsdon’s inability to have in-person visits with those individuals.[5] The defendants argue that that the restriction on Logsdon’s visits was effected with the objectives of protecting Logsdon’s children’s safety, and to enforce the FPP.[6] In support of that contention, defendants assert that the prison does not have the ability to ensure that visits between Logsdon and his children are conducted in accordance with the guidelines Dr.

---

[5]The record indicates that Logsdon’s teenage son, nephew, and ex-wife have been returned to the approved visitor’s list.

[6]See supra, n.4; PPD (Doc. No. 50-3), at 3.

Hoag identified as necessary to protect the children, due to the limited personnel resources available in the visiting room.[7] And because the FPP requires that any in-person visits between Logsdon and his children occur in accordance with Dr. Hoag's guidelines, the prison is unable to ensure that Logsdon's visits with his children will comply with the FPP. In addition, defendants are concerned with entrusting the minors' safety to Logsdon's adult relatives, given that they had previously brought the children to visit Logsdon in contravention of the then-existing sentencing order, and were unable to remove J.L. from the venue when she became upset.

As to the first factor, the protection of child visitors at the prison is a legitimate penological interest. See Overton, 539 U.S. at 133 (restrictions on prison visitation by children serve legitimate penological interest in "protecting children from harm"). To the extent the visit restriction was imposed to ensure compliance with the FPP, itself a court order ensuring the protection of the children's safety concerning contact with Logsdon, the defendants' basis for the restriction is equally legitimate. The restriction is thus rationally related to the DOC's valid interest in protecting children from harm and complying with court orders.

[7] Two to three correctional officers supervise the visits of up to fifty-three inmates who are permitted three adult visitors in a visiting session. See Kipphut Decl. (Doc. No. 50-2) at ¶ 20.

As to the second factor, Logsdon has not shown that he has no alternative means of protecting his First Amendment right to maintain a familial association with his children. "Alternatives to visitation need not be ideal . . . they need only be available." Overton, 539 U.S. at 135 (finding phone calls sufficient substitutes to protect an inmate's First Amendment right to visitation). The undisputed record reflects that prison officials have not sought to prevent or restrict Logsdon's ability to correspond with his children in writing, or to speak with them by telephone. Those means of associating with his children remain available to him and are sufficient to pass constitutional muster.

The third factor concerns the impact of accommodating Logsdon's visits with his children. Defendants assert that the NHSP visiting room staff resources are insufficient to ensure the children's safety during such visits. Logsdon has not demonstrated that accommodating his request for visits with his children would not create a need for significant reallocation of DOC personnel, to ensure that Logsdon's visits with his children were in compliance with the FPP. Logsdon suggests that the adults accompanying his children to the prison visits, with Dr. Hoag's approval, would be able to ensure compliance with the FPP. But, as previously noted, defendants have expressed a legitimate concern with those adults' ability to satisfy the FPP. The court will not second-guess prison

officials' decision not to relinquish their interest in ensuring the safety of children visiting the prison to third parties. See Overton, 539 U.S. at 132 (noting that court must give deference to prison administrators' in defining and accomplishing correction system's goals).

Finally, plaintiff did not offer evidence of any alternative means of accommodating his asserted right to visit with his children that would not impose more than a de minimis strain on the NHSP's resources.

The undisputed record demonstrates that the restriction on Logsdon's ability to visit with his children was "reasonably related to NHSP's legitimate penological objectives," i.e., the concern with the safety of the children and compliance with the FPP, rather than an "exaggerated response" to those concerns. Id. Accordingly, the court concludes that, to the extent that the restriction on Logsdon's visits with his children impinges on his First Amendment right to familial association, it does not do so in an unconstitutional manner. The district judge, therefore, should grant the defendants' motion for summary judgment as to Logsdon's First Amendment claim.

## II. Fourteenth Amendment Right to Due Process

Logsdon has also asserted that his right to procedural due process was violated when his visits with his children, Marylisa, and his nephew were restricted without notice or

process. Due process requirements apply only to the deprivation of protected interests in life, liberty, or property. See Mathews v. Eldridge, 424 U.S. 319, 332 (1976); González-Fuentes v. Molina, 607 F.3d 864, 880 n.13 (1st Cir. 2010). For the reasons stated above, Logsdon has failed to assert the deprivation of a protected liberty interest in familial association. See Thompson, 490 U.S. at 460 ("The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore is not independently protected by the Due Process Clause." (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)). Accordingly, Logsdon cannot demonstrate that he was entitled to procedural due process under the Fourteenth Amendment. The district judge should, therefore, grant defendants' motion for summary judgment on this claim.

## III. Laaman Consent Decree

In addition to his constitutional claims, Logsdon argues that the decision to restrict his family's visits violated a consent decree issued in a class action case in 1978, Laaman v. Helgemoe, Civ. No. 75-cv-258 (D.N.H.), which related to the conditions of confinement at the New Hampshire State Prison. But pursuant to a July 6, 2001, order approving a settlement agreement and stipulation of dismissal in that matter, see id. (ECF No. 523), jurisdiction to enforce the consent decree rests

exclusively in the state courts of New Hampshire. Therefore, no claim arising out of that consent decree may be asserted in this action, and the district judge should grant summary judgment in favor of the defendants with regard to Logsdon's claim that the defendants violated his rights under the Laaman Consent Decree.

IV. Denial of Used Book

In his complaint, Logsdon asserted a First Amendment claim based on the NHSP's refusal to allow him to acquire a particular book on the basis that it was used, rather than new, in violation of NHSP security regulations prohibiting inmates from receiving used books. Having determined that he can acquire the same book new, however, Logsdon has expressed his willingness to drop this claim. See Pltff. Mem. (Doc. No. 56) at 8. Accordingly, the district judge should dismiss Logsdon's First Amendment claim based on the denial of a book from this action, and deny the defendants' motion for summary judgment as moot.

## **Conclusion**

For the foregoing reasons, the district judge should grant defendants' motion for summary judgment (Doc. No. 50) with regard to Logsdon's First and Fourteenth Amendment claims concerning the denial of visitation, and his claim that such denial violated the Laaman Consent Decree. Further, the district judge should dismiss Logsdon's First Amendment claim

regarding the denial of a used book, and deny the defendants' summary judgment motion as moot to the extent it concerns the used book claim.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). The fourteen-day period may be extended upon motion. Failure to file specific written objections to the Report and Recommendation within the specified time waives the right to appeal the district court's order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

Andrea K. Johnstone
United States Magistrate Judge

February 28, 2019

cc: Timothy A. Logsdon, pro se
Heather Dunion Neville, Esq.